******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ANGELA ASHWORTH, ADMINISTRATRIX
(ESTATE OF CAROLINE ANNE
ASHWORTH) *v.* TOWN OF
BRANFORD ET AL.
(SC 21175)

Mullins, C. J., and McDonald, D'Auria, Ecker,
Alexander, Dannehy and Bright, Js.

*Syllabus*

The plaintiff, administratrix of the estate of the decedent, C, sought to
recover damages from the defendant S Co. for the allegedly wrongful death
of C, who had been shot and killed by M after M was discharged from a psy-
chiatric hospital operated by S Co. M had been in a romantic relationship
with C, but C eventually ended their relationship. In response, M went to a
hospital, where he reported to medical staff that he was distraught about the
end of that relationship, concerned that he would harm C, and was having
homicidal ideations. He also reported that he was depressed, having trouble
sleeping, using alcohol and drugs, and owned firearms. On the basis of this
information, a physician, pursuant to the statute (§ 17a-502 (a)) authorizing
the commitment of an individual, for up to fifteen days, when a physician
concludes that the individual has psychiatric disabilities and is a danger
to himself or others, involuntarily committed M for a fifteen day period.
Approximately one day after his involuntary commitment, M was transferred
from the hospital at which he was originally committed to S Co.'s psychiatric
hospital. Two days later, however, M was discharged. M's discharge plan did
not call for any further supervision, and no one at the psychiatric hospital
warned C or law enforcement about M's discharge. In counts two through six
of her complaint, the plaintiff alleged that S Co. knew, should have known,
or had reason to know that M had threatened serious harm to C, that S Co.
nevertheless failed to exercise reasonable care in its assessment, treatment,
monitoring, and discharge of M, and that S Co. also failed to take reason-
able measures to control M and to warn C of the danger M posed to her. In
count seven, the plaintiff alleged that S Co. had committed gross medical
negligence. S Co. filed a motion to strike the counts against it, which the
trial court granted and rendered judgment thereon. The court concluded
that counts two through six sounded in medical malpractice, insofar as the
negligence alleged therein was substantially related to the medical diagnosis
or treatment of M and involved the exercise of medical judgment. The court
also determined that, because C was not a patient of S Co., those counts were
barred as a matter of law in light of this court's holding in *Jarmie* v. *Tron-
cale* (306 Conn. 578) that a medical malpractice claim can be asserted only
by, or on behalf of, a patient against a health care provider. With respect to
count seven, the trial court concluded, inter alia, that Connecticut law does
not recognize gross negligence as a separate basis of liability. Thereafter,
the plaintiff appealed from the trial court's judgment in favor of S Co.,
contending, inter alia, that the trial court had incorrectly concluded that
all of the claims in counts two through six sounded in medical malpractice

and that the trial court had erred in failing to analyze her claims in those counts under ordinary negligence principles. *Held*:

The trial court incorrectly concluded that all of the claims in counts two through six of the plaintiff's complaint necessarily implicated the exercise of professional medical judgment and therefore sounded in medical malpractice.

Liberally construed, certain allegations in counts two through six sounded in ordinary negligence rather than in medical malpractice, as those allegations challenged S Co.'s reasonable response to a known, substantial risk of imminent physical harm to an identifiable victim.

Specifically, the allegations sounding in ordinary negligence included that S Co. had failed to take reasonably necessary steps to control M so as to prevent him from causing harm to or killing C, failed to use proper and available resources and measures to contact C to warn her of M's homicidal ideations directed at her, and prematurely discharged M when the fifteen day commitment period contemplated by § 17a-502 (a) had not yet expired.

The trial court correctly determined, however, that certain other allegations in counts two through six challenged the adequacy of S Co.'s evaluation, diagnosis, or treatment of M, or its administration of medication or discharge planning with respect to M, all of which required the exercise of professional medical judgment arising from the physician-patient relationship between S Co. and M.

Specifically, the allegations sounding in medical malpractice included that S Co. had failed to contact other sources to verify information provided by M, discharged M without performing an adequate assessment of risk, failed to properly assess the effects of M's alcohol and drug use, failed to adequately treat M's intrusive thoughts, failed to properly titrate M's medication upon discharge, released M under his own care, and failed to assess how M would act upon discharge if he were to come into contact with C.

This court held, as a matter of first impression, that a mental health care provider who knows that a patient poses a substantial risk of imminent physical harm to an identifiable, nonpatient third party owes a duty to the nonpatient to take reasonable steps to protect him or her from the danger posed by the patient, and such steps may include warning the nonpatient of the risk or controlling the patient.

Although this court had previously expressed a general aversion to extending the duty of health care providers to nonpatient third parties, it also had, under limited circumstances, recognized the potential for liability in cases, such as the present one, involving an identifiable potential victim who will be foreseeably harmed as a result of a health care provider's negligence.

The extension of a limited, common-law duty to mental health care providers treating psychiatric patients was consistent with the statutory scheme governing emergency involuntary commitment, including § 17a-502, and the statutory scheme ((Supp. 2026) §§ 52-146d through 52-146j) governing the disclosure of communications and records concerning a patient's psychiatric

diagnosis and treatment, as well as the balance the legislature struck in those statutory schemes, which reflected consideration of the patient's liberty and privacy interests, as well as the need to protect both the patient and the public from physical harm.

Moreover, this court was not persuaded by S Co.'s arguments that the imposition of the duty recognized in the present case would subject the professional judgment of a mental health care provider to hindsight review, encourage defensive medical practices and unnecessary commitments, and expose providers to a broad wave of nonpatient liability arising from patients' acts of violence, as S Co.'s concerns were substantially mitigated by the limited nature of the duty recognized.

Furthermore, this court's recognition of the limited duty announced in this case was consistent with the prevailing approach adopted in other jurisdictions, with many of those jurisdictions having adopted a duty, such as the one recognized here, that is limited to circumstances in which the physician has actual knowledge of a threat to a readily identifiable victim.

Accordingly, this court reversed the trial court's judgment with respect to those allegations in counts two through six that could proceed under ordinary negligence principles and remanded the case with direction to deny S Co.'s motion to strike as to those allegations and for further proceedings.

This court declined to review the plaintiff's claim that the trial court had improperly struck count seven of her complaint, in which she alleged gross medical negligence, as that claim was inadequately briefed.

Although the plaintiff relied on and cited certain precedent from this court in support of her claim, she had previously acknowledged before the trial court that that precedent did not directly apply to her claim, and her briefing in this court provided little guidance as to how the cited precedent would support recognition of her gross medical negligence claim under the circumstances of this case.

(*One justice concurring in part and dissenting in part*)

Argued January 29—officially released August 4, 2026

*Procedural History*

Action to recover damages for, inter alia, the wrongful death of the plaintiff's decedent as a result of the defendants' alleged negligence, and for other relief, brought to the Superior Court in the judicial district of Hartford, where the court, *Klau, J.*, granted the motion to strike filed by the defendant SVMC Holdings, Inc.; thereafter, the court, *Klau, J.*, granted the plaintiff's motion for judgment and rendered partial judgment

for the defendant SVMC Holdings, Inc., from which the plaintiff appealed. *Reversed in part*; *further proceedings*.

*Carey B. Reilly*, with whom was *William M. Bloss*, for the appellant (plaintiff).

*Eric Del Pozo*, with whom was *Sarah E. Dlugoszewski*, for the appellee (defendant SVMC Holdings, Inc.).

*Opinion*

BRIGHT, J. Resolution of this appeal requires us to determine whether the administratrix of the estate of an identifiable nonpatient victim, who was murdered by a psychiatric patient following the patient's involuntary hospitalization and subsequent discharge, may sue the mental health care provider[1] that treated and discharged the patient. The plaintiff, Angela Ashworth, administratrix of the estate of Caroline Anne Ashworth (decedent), appeals[2] from the partial judgment of the trial court in

[1] For purposes of this opinion, we use the term "mental health care provider" to refer collectively to psychiatrists, psychologists, licensed professional counselors, clinical social workers, and marital and family therapists, each of whom is subject to a statutory provision that permits disclosure of confidential communications under certain circumstances. See General Statutes § 52-146c (c) (3) (disclosure is permitted when psychologist believes in good faith that patient poses "risk of imminent personal injury" to himself or others); General Statutes § 52-146f (2) (disclosure is permitted when psychiatric mental health provider determines that patient poses "substantial risk of imminent physical injury" to himself or others); General Statutes § 52-146p (c) (2) (disclosure is permitted when marital and family therapist believes in good faith that failure to disclose "presents a clear and present danger to the health or safety of any individual"); General Statutes § 52-146q (c) (2) (disclosure is permitted when clinical social worker determines person poses "a substantial risk of imminent physical injury" to himself or others); General Statutes § 52-146s (c) (4) and (5) (disclosure is permitted when professional counselor believes in good faith that failure to disclose "presents a clear and present danger to the health or safety of any individual" or that person poses "risk of imminent personal injury" to himself or others). Because the mental health care provider in the present case is a psychiatrist who falls within the ambit of § 52-146f (2), we need not decide whether the duty recognized in this opinion extends to other licensed professionals providing mental health treatment.

[2] The plaintiff appealed from the partial judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-2.

favor of the defendant SVMC Holdings, Inc.,[3] rendered after the court granted the defendant's motion to strike counts two through eight of the plaintiff's third amended complaint (complaint). The trial court, in striking the plaintiff's claims against the defendant, concluded that those claims sounded in medical malpractice and that, pursuant to Connecticut's statutory scheme, as explained by this court in *Jarmie* v. *Troncale*, 306 Conn. 578, 50 A.3d 802 (2012), only a patient may assert such claims. Given this conclusion, the court did not address whether the defendant owed the decedent a duty of care if the plaintiff's claims in counts two through six were viewed as ordinary negligence claims, as characterized by the plaintiff. On appeal, the plaintiff claims that the court erred in categorizing her claims in counts two through six[4] as sounding in medical malpractice and further argues that this court has previously recognized that a mental health care provider owes a duty of care to an identifiable third party such as the decedent in this case. Additionally, the plaintiff claims that the court erred in striking count seven of her complaint, which purported to assert a claim of gross medical negligence.

We conclude that the trial court incorrectly determined that all of the plaintiff's allegations against the defendant sound in medical malpractice. To the extent that the complaint alleges that the defendant actually *knew*

---

[3] The town of Branford and Christopher J. Donlin, administrator of the estate of Michael Mollow, are also defendants in this action. Neither Donlin nor the town is participating in this appeal because separate claims against them remain pending in the trial court. We therefore refer in this opinion to SVMC Holdings, Inc., as the defendant.

[4] Although the plaintiff argues that the trial court erred when it decided "that the plaintiff's claims all sounded in medical malpractice under [General Statutes] § 52-190a and, thus, were insufficient because the trial court [determined that] that statute allows only patients to sue for medical malpractice," only counts two through six are pleaded as ordinary negligence claims. Counts seven and eight are pleaded as medical negligence claims, which the plaintiff contends are not limited by the requirements of § 52-190a and *Jarmie*. Thus, we address counts seven; see part III of this opinion; and eight; see footnote 12 of this opinion; separately.

that the patient posed a substantial risk of imminent physical harm to an identifiable victim and failed to exercise reasonable care to protect that victim, including, for instance, by failing to warn her or to adequately control the patient, we conclude that the claims sound in ordinary negligence rather than medical malpractice. We further hold, for the first time, that a mental health care provider who actually knows that his or her patient poses a substantial risk of imminent physical harm to an identifiable victim has a duty to exercise reasonable care to protect that victim from that danger. We clarify in this opinion both the narrow circumstances under which this duty arises and the limited scope of the duty.[5] Accordingly, we conclude that the trial court improperly granted the defendant's motion to strike counts two through six of the plaintiff's complaint and reverse in part the partial judgment of the trial court. We do not address the plaintiff's claim that she may pursue a claim of gross medical negligence against the defendant because it is inadequately briefed.

We begin by setting forth the facts alleged in the plaintiff's complaint, construed in the manner most favorable to sustaining its legal sufficiency, along with the relevant procedural history. See, e.g., *Doe* v. *Cochran*, 332 Conn. 325, 328, 210 A.3d 469 (2019).

In late 2019 or early 2020, the decedent, then approximately eighteen years old, and Michael Mollow, then approximately fifty-seven years old, began a romantic relationship. During the course of the relationship, Mollow provided the decedent with financial support and exercised control over her transportation, movements,

---

[5]Because we conclude that the plaintiff's claims that sound in medical malpractice are precluded as a matter of law by this court's prior holding in *Jarmie* v. *Troncale*, supra, 306 Conn. 588–89, our analysis is limited to the duty owed to an identifiable third party arising out of a mental health care provider's ordinary negligence. Accordingly, we have not considered the scope of the duty, if any, that a health care provider may owe to an identifiable third party arising out of the provider's medical malpractice if General Statutes § 52-190a were interpreted in the manner suggested in the concurring and dissenting opinion, or otherwise interpreted or amended so as to permit the consideration of such claims.

and communications with others. Mollow initially paid her rent, but, after he stopped making payments, the decedent incurred debt and moved into his residence. In July 2022, Mollow and the decedent purchased a truck together for the decedent's use, but Mollow retained sole title without the decedent's knowledge. The truck was equipped with an application that Mollow used to track the decedent's movements via global positioning system (GPS) technology.[6]

In August 2022, officers from the Branford Police Department responded to multiple domestic disturbance incidents involving the decedent and Mollow. During these incidents, the decedent informed the responding officers that Mollow previously had threatened to shoot her and had choked her and physically assaulted her. Mollow admitted to the police that he tracked the decedent's location using a GPS application, possessed unsecured firearms in his home, and had initiated at least two confrontations with the decedent that involved violent, physical contact.[7] The decedent also informed the police that Mollow had been displaying controlling behavior by disrupting her cell phone service and by preventing her from using the truck and from earning her own income.

On or about August 22, 2022, the decedent moved out of Mollow's residence and drove the truck to Alabama to visit her grandmother. In the early morning hours of August 23, Mollow went to the emergency department at MidState Medical Center (MidState). There, he reported to medical staff that he was "emotionally distraught" because the decedent had ended their three year relationship. He told medical staff that he had specific homicidal ideations toward the decedent and feared that he would hurt her if she returned to Connecticut. He also reported

[6]Mollow, at times, restricted the decedent's use of the truck by removing the license plate or reporting to the police that the truck had been stolen. On August 15, 2022, Mollow reported to the police that the decedent had stolen the truck and that he was actively tracking its location.

[7]It is unclear from the complaint whether the violent, physical contact was limited to Mollow's conduct or whether it also included the decedent's conduct.

that he was " 'obsessed' " with the decedent, had been suffering from sleep disturbances, had been using alcohol and Xanax obtained " 'off the street,' " and "did not feel able to remain safe outside [of] a hospital environment . . . ." He informed the staff that he possessed a pistol permit and owned firearms located at his residence. Based on this information, a MidState emergency medicine physician executed a fifteen day, involuntary emergency certificate pursuant to General Statutes § 17a-502, opining that Mollow " 'ha[d] psychiatric disabilities,' " was a danger to himself or others, and needed "immediate care and treatment in a hospital . . . ." In the emergency certificate, the MidState physician certified that Mollow presented with " 'positive homicidal ideation [toward his former] girlfriend, depress[ion], insomnia, [and a] poor appetite.' "

Further, MidState staff contacted the Branford Police Department and disclosed that Mollow had been admitted to the hospital after reporting homicidal thoughts directed toward the decedent, who was in Alabama at the time. MidState staff provided the police with the decedent's cell phone number and, in subsequent calls, informed officers that Mollow owned firearms and had been hospitalized because of his reaction to his breakup with the decedent. An officer attempted to contact the decedent on her cell phone but did not reach her and could not leave a voicemail. He took no further action and marked the investigation as " 'inactive . . . .' "

The day after his admission to MidState, Mollow was transferred to the defendant's psychiatric hospital, St. Vincent's Medical Center (SVMC) in Westport, pursuant to the emergency certificate. Mollow's medical records from MidState stated that, around the time of the transfer, Mollow was "demonstrating 'anger and nonspecific thoughts of hurting his ex-girlfriend' and a 'tendency toward obsessive thinking,' [and his] status remained as an involuntary admission." Upon his admission to SVMC, Mollow informed medical personnel that he (1) had been hospitalized because he had thoughts of harming or killing the decedent, (2) was depressed and having trouble

sleeping, and was using alcohol and nonprescription Xanax, and **(3)** was requesting medication "to stop his 'intrusive thoughts'" about harming the decedent and to help him sleep.

Approximately two days later, the attending psychiatrist at SVMC, Nayla Hariz, discharged Mollow from SVMC. SVMC provided Mollow with a discharge plan that involved Mollow's following up with his primary care physician for medication management and attending an appointment with a social worker five days later. Mollow was released with no additional plan for further supervision.

The following evening, Mollow tracked the GPS location of the decedent's truck and followed her to a condominium complex in Wethersfield, armed with one of his firearms. The decedent was seated inside the truck in the parking lot of the complex when Mollow confronted her and shot her three times, killing her. Mollow then took his own life.

The plaintiff brought this action against Christopher J. Donlin, administrator of Mollow's estate, the town of Branford, and the defendant. See footnote 3 of this opinion. On March 20, 2024, the plaintiff filed her third amended complaint, which is the operative pleading. Counts two through eight of the complaint are directed toward the defendant. In broad terms, those counts assert several related theories of liability arising from the defendant's alleged conduct in evaluating, treating, and discharging Mollow, and in failing to take reasonable steps to prevent him from harming the decedent. Count two alleges that the defendant breached its duty to control Mollow or to warn the decedent of Mollow's threats against her. Counts three through five invoke duties arising from special relationships and from §§ 315[8] and

---

[8] Section 315 of the Restatement (Second) of Torts provides: "There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless (a) a special relation exists between the actor and the third person [that] imposes a duty [on] the actor to control the third person's conduct, or (b) a special relation

319[9] of the Restatement (Second) of Torts, and §41[10] of the Restatement (Third) of Torts, Liability for Physical and Emotional Harm. Counts six through eight assert claims for ordinary negligence, gross medical negligence, and common-law medical negligence based on the same underlying conduct. Across these counts, the plaintiff alleges that the defendant knew, should have known, or had reason to know that Mollow had threatened serious harm to the decedent, whom the complaint alleges was his "readily identifiable, foreseeable target," and nevertheless failed to exercise reasonable care in its assessment, treatment, monitoring, and discharge of Mollow and to take reasonable measures to control him and to warn the decedent of the danger he posed to her.

On May 15, 2024, the defendant moved to strike counts two through eight of the plaintiff's complaint "on the [ground] that the counts fail to allege a cognizable duty of care that was owed to the . . . decedent." The plaintiff objected, and the defendant replied.

On January 10, 2025, the trial court granted the defendant's motion to strike. In its memorandum of decision, the court concluded that, notwithstanding the plaintiff's characterization of the claims, the counts sounded in medical malpractice because the alleged negligence was of

exists between the actor and the other [that] gives to the other a right to protection." 2 Restatement (Second), Torts §315, p. 122 (1965).

[9]Section 319 of the Restatement (Second) of Torts provides: "One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm." 2 Restatement (Second), Torts §319, p. 129 (1965).

[10]Section 41 of the Restatement (Third) of Torts, Liability for Physical and Emotional Harm, provides: "(a) An actor in a special relationship with another owes a duty of reasonable care to third parties with regard to risks posed by the other that arise within the scope of the relationship.

"(b) Special relationships giving rise to the duty provided in [s]ubsection (a) include: (1) a parent with dependent children, (2) a custodian with those in its custody, (3) an employer with employees when the employment facilitates the employee's causing harm to third parties, and (4) a [mental health] professional with patients." 2 Restatement (Third), Torts, Liability for Physical and Emotional Harm §41, pp. 64–65 (2012).

a specialized nature arising out of a medical professional-patient relationship, was substantially related to the medical diagnosis or treatment of Mollow, and involved the exercise of medical judgment. Relying on our interpretation of General Statutes § 52-190a in *Jarmie* v. *Troncale*, supra, 306 Conn. 578, the court explained that a medical malpractice action must be brought by a *patient* because the statute limits such claims to negligence occurring " ' 'in the care or treatment of the claimant,' '" and, therefore, the court concluded that, because the decedent was not a patient of the defendant, the plaintiff's claims were barred as a matter of law.

With respect to count seven, in which the plaintiff advances a claim for gross medical negligence, the trial court concluded that Connecticut law does not recognize gross negligence as a separate basis of liability and declined to extend the holding of *Squeo* v. *Norwalk Hospital Assn.*, 316 Conn. 558, 580–81, 113 A.3d 932 (2015), to the plaintiff's claim.[11] The court further rejected the plaintiff's contention that count eight of the complaint alleged common-law medical negligence outside the purview of § 52-190a.[12] In granting the motion to strike, the court emphasized that its rul-

---

[11]The trial court explained that the "narrow" holding of *Squeo* v. *Norwalk Hospital Assn.*, supra, 316 Conn. 580–81, "leaves the legal door open, however slightly, for judicial recognition of other ordinary negligence claims rooted in medical malpractice" but "did not create a general, stand-alone cause of action for gross negligence." The court declined the plaintiff's invitation "to recognize her 'duty to warn' claim as sufficiently akin to a *Squeo* bystander emotional distress claim," reasoning that this court has counseled restraint in recognizing duties to nonpatient third parties and that, in light of the disagreement among the justices in *Doe* regarding the scope of *Squeo*; see, e.g., *Doe* v. *Cochran*, supra, 332 Conn. 379–80 n.2 (*Robinson*, *C. J.*, dissenting); it would not read *Squeo* expansively.

[12]The trial court struck the plaintiff's claim in count eight of the complaint, premised on common-law medical negligence, reasoning that "[t]he fatal flaw in the plaintiff's argument is that there is no legal distinction under Connecticut law between 'statutory' medical malpractice and 'common-law' medical malpractice." The court rejected the plaintiff's argument that a cause of action for common-law medical malpractice may be sustained notwithstanding the requirements of

ing was limited to the claims as pleaded and expressly declined to decide whether all " 'duty to warn' " causes of action against mental health care providers necessarily sound in medical malpractice. After the plaintiff elected not to replead, the court rendered partial judgment for the defendant. This appeal followed.

On appeal, the plaintiff argues that the trial court incorrectly determined that all of her claims against the defendant in counts two through six sounded in medical malpractice under § 52-190a and, therefore, could not be maintained by a nonpatient. The plaintiff contends that, in light of *Fraser* v. *United States,* 236 Conn. 625, 674 A.2d 811 (1996)—which, she claims, consistent with *Tarasoff* v. *Regents of the University of California*, 17 Cal. 3d 425, 431, 439, 551 P.2d 334, 131 Cal. Rptr. 14 (1976), recognized that mental health care providers owe a duty to protect identifiable victims from threats of serious physical harm posed by their patients—the trial court erred in failing to analyze the plaintiff's claims under ordinary negligence principles. Alternatively, she claims that Connecticut law recognizes a claim for gross medical negligence by nonpatients and that the trial court therefore erred in striking count seven of her amended complaint.

In resolving the plaintiff's principal claim, we must first determine whether each of the allegations struck by the trial court sounds in medical malpractice or, instead, in ordinary negligence. If any of the allegations sound in ordinary negligence, we must then determine whether, under the circumstances presented, Connecticut law recognizes a duty of care owed by the defendant to the decedent, a nonpatient third party, and, if so, the scope of that duty.

§ 52-190a. It explained that medical malpractice claims are common-law claims that are " 'procedurally circumscribed by statute,' " and, thus, there is no "statutory cause of action separate and independent from the common-law claim." On appeal to this court, although the plaintiff acknowledges that the trial court struck count eight of the complaint, she advances no claim of error with respect to that ruling.

## I

We first consider whether the trial court correctly determined that counts two through six of the complaint sound in medical malpractice and, accordingly, are barred by virtue of §52-190a and *Jarmie* because the decedent never was a patient of the defendant.

As a preliminary matter, we set forth the applicable standard of review and relevant legal principles regarding medical malpractice actions. "The standard of review in an appeal challenging a trial court's granting of a motion to strike is well established. A motion to strike challenges the legal sufficiency of a pleading, and, consequently, requires no factual findings by the trial court. As a result, our review of the court's ruling is plenary. . . . We take the facts to be those alleged in the [pleading] that has been stricken and we construe the [pleading] in the manner most favorable to sustaining its legal sufficiency." (Internal quotation marks omitted.) *Jarmie* v. *Troncale*, supra, 306 Conn. 583.

"[I]f facts provable in the complaint would support a cause of action, the motion to strike must be denied. . . . Moreover, we note that [w]hat is necessarily implied [in an allegation] need not be expressly alleged. . . . It is fundamental that in determining the sufficiency of a complaint challenged by a defendant's motion to strike, all well-pleaded facts and those facts necessarily implied from the allegations are taken as admitted. . . .

"In Connecticut, we long have eschewed the notion that pleadings should be read in a hypertechnical manner. Rather, [t]he modern trend, which is followed in Connecticut, is to construe pleadings broadly and realistically, rather than narrowly and technically. . . . [T]he complaint must be read in its entirety in such a way as to give effect to the pleading with reference to the general theory [on] which it proceeded, and do substantial justice between the parties. . . . Our reading of pleadings in a manner that advances substantial justice means that a pleading must be construed reasonably, to contain all that it fairly means, but carries with it the related

proposition that it must not be contorted in such a way so as to strain the bounds of rational comprehension." (Citation omitted; internal quotation marks omitted.) *Doe* v. *Cochran*, supra, 332 Conn. 333–34.

In *Jarmie*, we interpreted § 52-190a (a)[13] to mean that "a cause of action alleging medical malpractice must be brought by a *patient* against a health care provider because the language of the statute specifically provides that the alleged negligence must have occurred 'in the care or treatment of the claimant.'" (Emphasis in original.) *Jarmie* v. *Troncale*, supra, 306 Conn. 587. Consequently, the plaintiff acknowledges that, if her negligence claims sound in medical malpractice, such claims are governed by § 52-190a and cannot proceed because the decedent never was a patient of the defendant.[14]

Nevertheless, not all claims against health care providers sound exclusively in medical malpractice. See, e.g.,

[13]General Statutes § 52-190a (a) provides in relevant part: "No civil action or apportionment complaint shall be filed to recover damages resulting from personal injury or wrongful death occurring on or after October 1, 1987, whether in tort or in contract, in which it is alleged that such injury or death resulted from *the negligence of a health care provider*, unless the attorney or party filing the action or apportionment complaint has made a reasonable inquiry as permitted by the circumstances to determine that there are grounds for a good faith belief that there has been negligence *in the care or treatment of the claimant.* . . ." (Emphasis added.)

[14]We note that § 52-190a was enacted primarily to deter frivolous medical malpractice actions by requiring a presuit investigation and a certificate of good faith. See, e.g., *Dias* v. *Grady*, 292 Conn. 350, 357–58, 972 A.2d 715 (2009) ("[T]he purpose of the original version of § 52-190a was to prevent frivolous medical malpractice actions. . . . In 2005, the legislature amended § 52-190a (a) to include a provision requiring the plaintiff in a medical malpractice action to obtain the written opinion of a similar health care provider that there appears to be evidence of medical negligence and to attach the opinion to the certificate of good faith to be filed with the complaint. . . . The legislative history of this amendment indicates that it was intended to address the problem that some attorneys, either intentionally or innocently, were misrepresenting in the certificate of good faith the information that they had obtained from experts." (Citations omitted; internal quotation marks omitted.)); see also *Bruttomesso* v. *Northeastern Connecticut Sexual Assault Crisis Services, Inc.*, 242 Conn. 1, 15, 698 A.2d 795

*Doe* v. *Cochran*, supra, 332 Conn. 336. Indeed, "our courts have long recognized that a health care provider may commit ordinary negligence, as opposed to medical malpractice, in the course of treating a patient or providing medical services." Id., 334. A claim may sound in ordinary negligence,[15] "rather than (or in addition to) medical malpractice," depending on the circumstances. Id.; see also *Jarmie* v. *Troncale*, supra, 306 Conn. 586. Thus, "[t]he classification of a negligence claim as either medical malpractice or ordinary negligence requires a court to review closely the circumstances under which the alleged negligence occurred." (Internal quotation marks omitted.) *Jarmie* v. *Troncale*, supra, 587.

In *Jarmie*, the plaintiff, who was injured when the defendant physician's patient blacked out while driving and struck the plaintiff's vehicle, alleged that the physician had negligently failed to warn the patient that her medical condition impaired her ability to operate a motor vehicle safely. Id., 580–81. In considering the legal sufficiency of the claim, we analyzed the complaint under both medical malpractice and ordinary negligence frameworks. Id., 586.

(1997) ("[t]he purpose of the legislation is to inhibit a plaintiff from bringing an inadequately investigated cause of action, whether in tort or in contract, claiming negligence by a health care provider"). Nothing in the statute's legislative history indicates that the legislature specifically intended to address whether nonpatients may bring negligence claims against health care providers. Nevertheless, in *Jarmie*, we interpreted § 52-190a to mean that a medical malpractice action may be brought only by a patient. See *Jarmie* v. *Troncale*, supra, 306 Conn. 588–89. Although one could reasonably question whether the legislature intended § 52-190a to operate as a bar to medical malpractice claims brought by nonpatients against health care providers, our interpretation in *Jarmie* of the statutory text, which the plaintiff does not challenge in this appeal, does not permit a different construction.

[15]What *Jarmie* sometimes refers to as "common-law negligence"; *Jarmie* v. *Troncale*, supra, 306 Conn. 585; is what we, and the parties, refer to as "ordinary negligence" in the present case. We use the term "ordinary negligence" because we believe that it better captures the distinction between claims judged by the reasonable care of an ordinary person and those that involve the exercise of professional medical judgment.

We first addressed whether the complaint could survive a motion to strike if it sounded in medical malpractice for purposes of §52-190a. Id. We explained that "[p]rofessional negligence or malpractice . . . [is] defined as the failure of one rendering professional services to exercise that degree of skill and learning commonly applied under all the circumstances in the community by the average prudent reputable member of the profession with the result of injury, loss, or damage to the recipient of those services. . . . [M]alpractice presupposes some improper conduct in the treatment or operative skill [or] . . . the failure to exercise requisite medical skill . . . ."(Emphasis omitted; internal quotation marks omitted.) Id., 587–88.

We then set forth the relevant considerations for determining whether a claim sounds in medical malpractice: "whether **(1)** the defendants are sued in their capacities as medical professionals, **(2)** *the alleged negligence* is of a specialized medical nature that *arises out of the medical professional-patient relationship*, and **(3)** *the alleged negligence is substantially related to medical diagnosis or treatment* and involved the exercise of medical judgment." (Emphasis in original; internal quotation marks omitted.) Id., 588. Such claims, we emphasized, typically require expert testimony in order to establish the applicable standard of care and the deviation from that standard. Id.

Applying those principles, we determined that the plaintiff's claim sounded in medical malpractice; see id., 588–89; because the complaint alleged that the plaintiff's injuries were caused by the physician's "[deviation from the accepted standard of care applicable to the treatment of the patient] in that [the physician] failed to . . . advise and warn [the patient] not to drive a vehicle." (Internal quotation marks omitted.) Id., 581. Accordingly, we concluded that, "insofar as the [physician and his employer] characterize[d] the plaintiff's complaint as sounding in medical malpractice, it [was] legally insufficient because it contain[ed] no allegations that the [parties] had a physician-patient relationship

as required under Connecticut's medical malpractice law." Id., 588–89.

We then considered whether the physician owed the nonpatient plaintiff a duty of care under ordinary negligence principles. Id., 589. We concluded that he did not, in part because the alleged standard of care turned inherently on the exercise of professional medical judgment, as it required a determination of when, in the course of diagnosis and treatment, a patient's condition warranted a warning. See id., 610. As we observed, most diseases that impair a patient's ability to drive develop gradually, progress at different rates, and can be difficult to detect in their early stages; depending on the circumstances, the health care provider, in his or her professional judgment, might not deem it necessary to warn the patient regarding the risks of driving. See id., 610–11. Extending such a duty to nonpatients in that context would, "in some cases, allow strangers in their capacity as jurors and medical experts to substitute their judgment for that of physicians and patients . . . ." Id., 609. It could also "interfere significantly with a health care provider's discretion to treat and counsel patients in accordance with an assessment of the patient's individual needs." Id., 613.

In *Doe* v. *Cochran*, supra, 332 Conn. 325, however, we recognized that a negligence claim brought by a non-patient against a health care provider may sound in ordinary negligence, rather than malpractice, when the alleged negligence does not implicate the provider's professional judgment. See id., 336–38. The defendant physician in *Doe* negligently misreported to a patient that the patient had tested negative for a sexually transmitted disease (STD) when the laboratory results clearly indicated a positive diagnosis. Id., 327–29. The physician was aware that the patient sought testing "for the protection and benefit of" the plaintiff, the patient's exclusive romantic partner. Id., 328. Under those circumstances, we concluded that the plaintiff's claims

"need not be read to sound in medical malpractice." Id., 336. Central to our reasoning was that the alleged negligence did not involve the exercise of professional medical judgment or skill. See id., 336–37. Rather, it involved a rudimentary failure to convey accurate information. See id. We observed that the determination of whether the defendant was negligent in giving a patient the wrong test results was "well within the ken of a layperson" and would not require expert testimony. Id., 337. Because the alleged negligence consisted of a failure to report accurate test results in light of information already in the physician's possession, the claim sounded in ordinary negligence rather than medical malpractice. See id., 336–38, 368–69.

What these cases make clear is that there is an important distinction between allegations that a mental health care provider "knew" of a risk after exercising his professional judgment and failed to take reasonable steps not involving medical judgment to account for that risk, and allegations that the mental health care provider "should have known" or "had reason to know" of a risk but failed to use reasonable care in exercising that judgment. Determining whether a mental health care provider *should have* recognized a risk and exercised medical judgment to mitigate that risk requires a retrospective evaluation of the provider's clinical assessment and exercise of judgment in diagnosing and treating the patient. Such inquiries ask a fact finder—typically with the help of expert testimony—to determine whether the provider properly exercised the degree of professional skill and learning ordinarily possessed by practitioners in the field. See id., 334–35. As a result, allegations framed in terms of what a provider should have known or had reason to know, or how they should have treated the patient, challenge the adequacy of the provider's professional evaluation and care of the patient and, therefore, sound in medical malpractice. See, e.g., *Gold* v. *Greenwich Hospital Assn.,* 262 Conn. 248, 255, 811 A.2d 1266 (2002).

When the complaint alleges that the mental health care provider actually *knew* that the patient posed a substantial risk of imminent physical harm to an identifiable person but failed to exercise reasonable care to protect the victim, however, it does not challenge the adequacy of the provider's professional judgment in the medical evaluation, diagnosis, or treatment of the patient. In this context, "knew" refers to actual knowledge—that is, the provider *already had determined*, based on the provider's professional medical judgment, that the patient posed a substantial risk of imminent physical harm to an identifiable victim, even though the provider could not know with certainty that the patient would in fact harm the victim. When such actual knowledge is alleged, the relevant inquiry is whether the mental health care provider, having recognized that the patient posed a substantial risk of imminent physical harm to an identifiable victim, exercised reasonable care under the circumstances to protect that victim from the foreseeable harm. In other words, the inquiry concerns whether the provider took reasonable nonmedical steps to protect the identifiable victim once the risk was actually known. Of course, the discharge of this duty of care will necessarily vary with the facts of each case.

To be clear, to state a claim of ordinary negligence similar to what was alleged in *Doe*, the alleged negligence must be capable of being "judged against the standard of what a reasonable person would have done under the circumstances . . . ." (Internal quotation marks omitted.) *Doe* v. *Cochran*, supra, 332 Conn. 335. For example, with respect to an allegation that the defendant negligently failed to control the patient, if a mental health care provider concludes that a patient poses a substantial risk of imminent physical harm to an identifiable third person and intends to control that patient but negligently fails to do so because of an accident, mistake, or other nonmedical error—such as leaving a door unsecured and permitting the patient to escape or incorrectly completing paperwork that results in an improper discharge—the negligent act itself would not implicate the exercise of professional

medical judgment. Similarly, if the mental health care provider concludes that the patient poses such a risk but does not take protective measures to control the patient for reasons unrelated to medical judgment—for example, because of financial, insurance, or logistical considerations—the alleged negligence may not concern the provider's professional judgment.

By contrast, if the mental health care provider concludes that a patient poses a substantial risk of imminent physical harm to an identifiable third person but determines, in the exercise of medical judgment, that hospitalization is unnecessary to control the patient because the risk is adequately managed through medication, outpatient treatment, or follow-up care, or because of some other medical determination, the claim would directly implicate the provider's professional medical judgment and would sound in medical malpractice under §52-190a and *Jarmie*. Thus, once the provider has determined that the patient poses the requisite risk, the claim sounds in ordinary negligence only insofar as the alleged failure to control the patient was not itself based on medical judgment. In such a case, just as the physician's failure to accurately communicate test results in *Doe* was judged by the ordinary reasonable person standard, so, too, would the mental health care provider's conduct taken in response to a known, substantial risk of imminent physical harm to an identifiable third party.

Such line drawing does not come into play when the allegation is that the mental health care provider failed to warn an identifiable third party of a substantial risk of imminent physical harm. In such a case, the provider has already exercised its medical judgment to determine that the risk of harm exists, and the decision whether to warn does not involve treatment of the patient. Instead, the reasonableness of the provider's conduct can be judged by what an ordinary person would do under such circumstances.

Accordingly, to the extent that the plaintiff's complaint alleges that the defendant *should have known* or

*had reason to know* that Mollow posed a danger to the decedent, those allegations sound in medical negligence and cannot be maintained on behalf of the decedent, a nonpatient. Allegations that the defendant actually *knew* of the risk and nevertheless was negligent in the ways that do not involve medical judgment set forth in the remainder of the complaint, however, may support claims sounding in ordinary negligence.

With these principles in mind, we turn to the allegations of the complaint.

In counts two through six, the plaintiff alleged that, prior to Mollow's discharge, the defendant "knew, should have known or had reason to know that Mollow had a history of and/or propensity to cause harm to [the decedent]," "that Mollow had expressed specific threats of causing bodily harm to, or possibly the death of, [the decedent]," "that Mollow had the means to cause bodily harm to, or possibly the death of, [the decedent]," and "that Mollow desired to cause bodily harm to, or possibly the death of, [the decedent], who was Mollow's readily identifiable individual target." The complaint further alleged that the resulting harm to the decedent was foreseeable and that the defendant's negligence was the proximate cause of the decedent's injuries and resulting death. Count two, titled "Violation of Duty To Control and/or Warn To Avoid Injury to Identifiable Third Person," includes eleven specific allegations of negligence, which are repeated in substantially identical form in counts three through six.

As pleaded, several allegations in the complaint challenge the adequacy of the defendant's psychiatric evaluation, diagnosis, treatment, medication, or discharge planning, all of which require professional medical judgment arising from the physician-patient relationship between the defendant and Mollow. These include the allegations that the defendant "[failed] to contact collateral sources to verify information provided by Mollow," "[discharged] Mollow without performing adequate assessment of risk," "[failed] to properly assess the effects

of Mollow's alcohol use and use of Xanax," "[failed] to adequately treat Mollow's intrusive thoughts," "[failed] to properly titrate [Mollow's] medications . . . as of the time of discharge," "[discharged] Mollow under his own care,"and "[failed] to determine how Mollow would act upon discharge if he were to see [the decedent] . . . ."

By contrast, the plaintiff sets forth other allegations that do not challenge the adequacy of the defendant's medical treatment of Mollow. Specifically, the plaintiff alleges that the defendant "[failed] to take reasonably necessary actions to control Mollow to prevent him from causing harm to or killing [the decedent]" and "[failed] to use proper [and] available resources and measures to contact [the decedent] to warn her of Mollow's homicidal ideations directed specifically at [the decedent]." Further, the plaintiff alleged that the defendant was negligent in "[p]rematurely discharging Mollow . . . when the [emergency certificate] had not expired, Mollow was willing to stay in the hospital, and . . . his depression, sleep disorder and homicidal ideations toward [the decedent] had not been adequately treated . . . ."

Although the decision to discharge a patient generally involves the exercise of professional medical judgment; see, e.g., *Gold* v. *Greenwich Hospital Assn.*, supra, 262 Conn. 255; when read together with the plaintiff's allegations that the defendant actually *knew* at the time of discharge that Mollow posed a risk of harm to the decedent, the allegations regarding Mollow's discharge and the defendant's failure to control him may be broadly construed as asserting that the defendant, for reasons unrelated to medical diagnosis or treatment, failed to exercise reasonable care to protect the decedent.[16] As

[16]We recognize that the plaintiff's complaint does not allege *why* Hariz failed to control Mollow. Consequently, we cannot determine whether the alleged failure to act in this case, as pleaded, was based on medical judgment—indicating a medical malpractice claim—or, alternatively, on some other nonmedical reason—which could support a viable ordinary negligence claim. Nevertheless, we read the allegations of a complaint broadly to include the possibility of a legally cognizable claim. See, e.g., *Doe* v. *Cochran*, supra, 332 Conn. 333–34. Furthermore, recognizing

previously noted in this opinion, an allegation that the defendant failed to warn after having identified that the patient presents a substantial risk of imminent harm to an identifiable third party does not involve the exercise of medical judgment and may sound in ordinary negligence. Because these allegations concern the failure to take reasonable steps to protect an identifiable third-party victim from a dangerous patient, despite a known, substantial risk of imminent physical harm, they may sound in ordinary negligence rather than medical malpractice.

One other allegation requires further parsing because it contains both medical and nonmedical components. The plaintiff alleged that the defendant "[failed] to adequately and properly care for, treat, monitor, supervise and/or control Mollow, so as to protect [the decedent] from [Mollow's] causing her harm or death . . . ." To the extent that this allegation challenges the manner in which the defendant *cared for* or *treated* Mollow, it implicates the exercise of professional medical judgment and therefore sounds in medical malpractice. Insofar as the allegation asserts that the defendant, knowing of the substantial risk of imminent physical harm Mollow posed to the decedent, failed to *monitor*, *supervise*, or *control* him, it may concern the defendant's alleged failure to exercise reasonable care to protect an identifiable third party, to the extent that such failure was not based on medical judgment.

We disagree with the defendant that our decisions in *Gold* v. *Greenwich Hospital Assn.,* supra, 262 Conn. 248, and *Levin* v. *State*, 329 Conn. 701, 189 A.3d 572 (2018), compel the conclusion that all of the allegations in the plaintiff's complaint must be construed as sounding in medical malpractice. In *Gold*, the plaintiff sued a hospital and a physician for negligence after she was injured by a patient who had been treated at the hospital for an

that we have in this opinion more clearly defined the test for determining whether a mental health care provider's failure to control a patient sounds in medical malpractice or ordinary negligence, the plaintiff should be permitted to amend her complaint, if she so chooses, to allege the basis for Hariz' failure to act.

allergic reaction and discharged into the plaintiff's care. See *Gold* v. *Greenwich Hospital Assn.,* supra, 250–51. We concluded that the plaintiff's claim sounded in medical malpractice because it "implicate[d] the defendants' medical judgment in discharging [the patient] *without ascertaining* whether her psychological condition was such that she was a danger to others, e.g., the plaintiff." (Emphasis added.) Id., 255.

Similarly, in *Levin*, the plaintiff alleged medical negligence "resulting from the care, treatment, and custody of a patient, and from a failure to warn the decedent of the patient's dangerous propensities"; *Levin* v. *State*, supra, 329 Conn. 703; after a patient on an approved home visit from a state mental health facility killed his mother. See id., 704–705. The plaintiff alleged that the hospital's "level of care was below that of a reasonably prudent [health care] provider." Id., 705. We concluded that the action could not proceed because the claim was clearly "presented to, and authorized by, the claims commissioner [as] solely one of medical malpractice"; id., 708–709; and, accordingly, it was "exactly the sort of nonpatient medical malpractice action that *Jarmie* forbids." Id., 707. We did not consider in *Levin* whether the claim could be sustained under ordinary negligence principles because no such claim had been authorized by the claims commissioner. See id., 708–10. Thus, in both *Gold* and *Levin*, we concluded that the alleged negligence turned on the provider's exercise of professional medical judgment and therefore sounded in medical malpractice.

Instead, allegations that the defendant failed to take action to mitigate a known risk to the decedent, if not based on the exercise of medical judgment, are more akin to the negligence alleged in *Doe*. In the present case, the alleged negligence, premised on the claim that the defendant *knew* of the risk Mollow posed to the decedent, may not challenge the mental health care provider's exercise of professional medical judgment in evaluating, diagnosing, and treating the patient. Rather, the alleged negligence occurred only *after* the provider had determined

that the patient posed a substantial risk of imminent physical harm to an identifiable individual and may have been based on factors other than the defendant's exercise of medical judgment. In such a case, as in *Doe*, the provider's professional judgment is exercised in making the underlying medical determination based on the provider's assessment of the patient; once that determination has been made, however, the remaining question is whether the mental health care provider exercised the reasonable care of an ordinary person in responding to the known risk of harm. Resolving that question does not require the fact finder to evaluate whether the provider should have reached a different medical judgment; rather, like in *Doe*, it concerns conduct for which "[n]o advanced medical training was necessary . . . ." *Doe* v. *Cochran*, supra, 332 Conn. 336–37. Just as the determination of whether delivering the wrong test results "is well within the ken of a layperson"; id., 337; so, too, is the question of whether a mental health care provider was negligent in failing to control a patient the provider knew represented a substantial risk of imminent physical harm to an identifiable person or in failing to warn that person of that known risk.

In sum, we agree with the trial court that several of the plaintiff's allegations sound in medical malpractice because they challenge the manner in which the defendant evaluated and treated Mollow. Those allegations, therefore, are subject to the limitation of § 52-190a (a) and cannot be maintained by a nonpatient. See *Jarmie* v. *Troncale*, supra, 306 Conn. 587. We disagree, however, with the trial court's conclusion that *all* of the plaintiff's allegations necessarily implicate the exercise of professional medical judgment. Liberally construed, certain allegations challenge the defendant's reasonable response to a known, substantial risk of imminent physical harm to an identifiable victim, rather than to the adequacy of the defendant's medical evaluation or treatment of Mollow. As such, those allegations may be evaluated under ordinary negligence principles.

II

Having determined that some of the allegations in the plaintiff's complaint do not sound in medical malpractice, we must decide an issue this court has never squarely addressed: whether a mental health care provider who has actual knowledge that a patient poses a substantial risk of imminent physical harm to a specifically identifiable third person owes a duty of reasonable care to protect that person. We conclude that, in these limited circumstances, such a duty exists.

As a general rule, "absent a special relationship of custody or control, there is no duty to protect a third person from the conduct of another." (Internal quotation marks omitted.) Id., 592. Although it is well settled that physicians owe a duty of care to their patients; see id. ("physicians owe an ordinary duty to their patients not to harm them through negligent conduct and an affirmative duty to help them by providing appropriate care"); there is "no well established common-law rule that a physician owes a duty to warn or advise a *patient* for the benefit of another person." (Emphasis added.) Id. In the present case, the alleged duty is owed not to the patient for the benefit of another, but directly to the third-party victim.

The plaintiff contends that this court has repeatedly recognized the existence of a duty owed by a mental health care provider to an identifiable nonpatient victim. See, e.g., *Doe* v. *Cochran*, supra, 332 Conn. 338; *Gazo* v. *Stamford*, 255 Conn. 245, 252, 765 A.2d 505 (2001); *Jacoby* v. *Brinckerhoff*, 250 Conn. 86, 96, 735 A.2d 347 (1999); *Fraser* v. *United States*, supra, 236 Conn. 632–35. The defendant disputes this contention and argues that any discussions of a possible duty to such a person in our cases are dicta.

In *Fraser*, we considered, in response to a certified question from the United States Court of Appeals for the Second Circuit, whether a psychotherapist owed a duty to control a psychiatric outpatient to protect a third

party from the patient's violent conduct. See *Fraser* v. *United States*, supra, 236 Conn. 626, 629. The patient, who suffered from paranoid delusions and had long been receiving outpatient psychiatric care at a federal medical center, had stabbed a man to death. Id., 628–29. We acknowledged that, "[i]n its broader form," the certified question in *Fraser* addressed whether Connecticut law recognizes a duty arising from the psychotherapist-outpatient relationship that obligates the therapist "to control the behavior of the outpatient to prevent the outpatient from causing bodily harm to third persons"; id., 629–30; a duty recognized in *Tarasoff* v. *Regents of the University of California*, supra, 17 Cal. 3d 425.[17] However, we expressly declined to decide that broader question and, instead, confined our analysis to "whether a psychotherapist has a duty to exercise control to prevent an outpatient, who was not known to have been dangerous, from inflicting bodily harm on a victim who was neither readily identifiable nor within a foreseeable class of victims." *Fraser* v. *United States*, supra, 630. Under those circumstances, we declined to recognize a duty. Id., 632.

[17]In the landmark case *Tarasoff* v. *Regents of the University of California*, supra, 17 Cal. 3d 425, a patient informed his therapist that he intended to kill an identifiable young woman upon her return from Brazil. Id., 432. The therapist notified campus police, who briefly detained and then released the patient, but did not warn the victim or her family of the danger the patient posed. Id., 430, 432–33. Shortly after the victim's return, the patient went to her residence and killed her. Id., 433. The California Supreme Court concluded that, "[w]hen a therapist determines, or pursuant to the standards of his profession should determine, that his patient presents a serious danger of violence to another, he incurs an obligation to use reasonable care to protect the intended victim against such danger. The discharge of this duty may require the therapist to take one or more of various steps, depending [on] the nature of the case. Thus it may call for him to warn the intended victim or others likely to apprise the victim of the danger, to notify the police, or to take whatever other steps are reasonably necessary under the circumstances." Id., 431. Although California has since limited and defined the contours of that duty by statute; see footnote 21 of this opinion; the duty recognized in *Tarasoff* has served as the foundation for the recognition of similar duties in numerous jurisdictions across the country.

We have since discussed *Fraser* on several occasions. In *Jacoby* v. *Brinckerhoff*, supra, 250 Conn. 86, which involved a claim by a former spouse of a psychiatric patient that a psychiatrist's negligent treatment of the patient caused the deterioration of their marriage; id., 87–88; we explained that, "[i]n *Fraser*, we delineated the scope of the duty of a psychotherapist to control a psychiatric outpatient to prevent the patient from committing an imminent act of violence against a third person. . . . To protect the integrity of the therapeutic relationship, we held that a duty to disclose the substantial risk of such an act of violence would arise only if the third person was an identifiable victim or a member of a class of identifiable victims. . . . We declined to jeopardize that relationship except under the most compelling circumstances. Such an exception was warranted, we held, in the event of an imminent risk of serious personal injury to identifiable victims. . . . Third party claimants under *Fraser* must allege not only identifiability but physical injury." (Citations omitted.) Id., 96–97. Because the plaintiff had not alleged any physical injuries, her claim failed. Id., 97.

In *Gazo* v. *Stamford*, supra, 255 Conn. 245, we held that a snow removal contractor owed a direct duty of care to a pedestrian who had slipped on an icy sidewalk because the harm was foreseeable and public policy considerations supported the imposition of liability. Id., 250–51. We cited *Fraser* among several cases in which policy considerations have justified limiting the reach of a duty, describing *Fraser* as standing for the proposition that "[a] duty to disclose [a] substantial risk of [an] imminent act of violence arises only if [the] third person is [an] identifiable victim or [a] member of [a] class of identifiable victims . . . ." (Citation omitted.) Id., 252. Thus, in both *Gazo* and *Jacoby*, we assumed, based on *Fraser*, that a physician could owe a duty either to control a patient who posed a substantial risk of imminent harm to an identifiable third party or to warn of such risk, but in neither case was the existence of that duty essential to our holding.

Subsequently, in *Jarmie* v. *Troncale*, supra, 306 Conn 578, we stated that "[t]he only time that we have even *contemplated* enlarging the duty of a health care provider to include a person who is not a patient was [in *Fraser*] when we considered whether a psychotherapist owed a duty to a third party to control an outpatient, who was not known to have been dangerous." (Emphasis in original.) Id., 593. After determining that the complaint in *Jarmie* failed to state a cognizable claim for medical malpractice because the plaintiff was not the physician's patient; id., 588–89; we analyzed the claims under ordinary negligence principles and concluded that the physician owed no duty to the plaintiff. Id., 590–91. We reasoned, in part, that, because the plaintiff was not an identifiable victim or a member of an identifiable class of victims, "the potential victims of [the physician's] alleged negligence included any random pedestrian, driver, vehicular passenger or other person who happened to come in close proximity to a motor vehicle operated by [the patient] following her diagnosis." Id., 597. We explained that the foreseeability test applied by this court in the context of health care providers has consistently required an identifiable victim; id., 595–98; and, for reasons of public policy, declined to recognize a provider's duty to unidentifiable third persons. See id., 622. *Jarmie*, therefore, seemed to leave open the question of whether a health care provider owes a duty of care to an *identifiable* nonpatient.

In *Doe* v. *Cochran*, supra, 332 Conn. 325, we resolved that question, at least in part. We noted that, "although we consistently have expressed a general aversion to extending the duty of health care providers to third parties, we have allowed, under limited circumstances, for the imposition of liability to an identifiable potential victim who will be foreseeably harmed by a physician's negligence." Id., 350. We emphasized that "a principal reason that we . . . declined to recognize that the [physician in *Jarmie*] owed a duty to the plaintiff motorist was because the plaintiff was not an *identifiable* victim at the time that medical services were provided." (Emphasis in original.) Id., 347. In *Doe*, however, because the patient

told the defendant physician that he was seeking STD testing for the benefit of his exclusive girlfriend, we concluded that the plaintiff was "an identifiable, if not identified, potential victim of the [physician's] alleged negligence at the time that treatment was rendered." Id., 348; see id., 348–49 ("only one woman could have fit the description of [the patient's] exclusive girlfriend, and [the patient] presumably could have identified her by name if he had been asked to do so"). We explained that "[t]his identifiable victim requirement strikes an equitable balance between the interests at stake. Although a health care provider's liability may expand beyond his or her patients, its increased scope would encompass only those third-party victims of whose existence and potential exposure to harm the health care provider had been made aware . . . prior to the negligent act." Id., 349.

This appeal requires us to determine whether the duty we recognized in *Doe* should be extended to apply to mental health care providers treating psychiatric patients. The defendant argues that, even if the harm to the decedent was foreseeable because she was an identifiable third party, there are several policy reasons why this duty should not be so extended.[18] First, the defendant contends that recognizing a duty would conflict with Connecticut's statutory schemes governing civil commitment and the confidentiality of psychiatric communications. Specifically, the defendant contends that the legislature adopted a carefully crafted civil commitment framework that places substantial weight on protecting individual liberty by making commitment permissive under § 17a-502 (a) and discharge mandatory

---

[18]Foreseeability alone, however, does not create a legal duty. "Many harms are quite literally foreseeable, yet for pragmatic reasons, no recovery is allowed. . . . A further inquiry must be made, for we recognize that duty is not sacrosanct in itself . . . but is only an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection. . . . The final step in the duty inquiry, then, is to make a determination of the fundamental policy of the law, as to whether the defendant's responsibility should extend to such results." (Internal quotation marks omitted.) *Jarmie* v. *Troncale*, supra, 306 Conn. 590.

under § 17a-502 (b) and (f). According to the defendant, this choice weighs against recognizing any common-law duty that would expose providers to liability for failing to confine a patient or to otherwise protect third parties. The defendant, quoting *Jarmie* v. *Troncale*, supra, 306 Conn. 610, also argues that recognition of such a duty would conflict with the confidentiality protections set forth in General Statutes (Supp. 2026) § 52-146e, which generally prohibit disclosure of confidential psychiatric communications and records, and would undermine the physician-patient relationship by "pull[ing] the physician in different directions . . . ." (Internal quotation marks omitted.)

Section 17a-502 governs emergency involuntary hospitalization through an emergency certificate. The statute permits the involuntary commitment of "[a]ny person who a physician concludes has psychiatric disabilities and is dangerous to himself or others or gravely disabled, and is in need of immediate care and treatment in a hospital for psychiatric disabilities . . . ." General Statutes § 17a-502 (a). In such circumstances, the individual "may be confined in such a hospital . . . under an emergency certificate . . . for not more than fifteen days without order of any court . . . ." General Statutes § 17a-502 (a). The statute further requires that the physician issuing the emergency certificate personally examine the patient and state (1) "the findings of the physician relative to the physical and mental condition of the person and the history of the case, if known," (2) "that it is the opinion of the physician that the person examined has psychiatric disabilities and is dangerous to himself or herself or others or gravely disabled and is in need of immediate care and treatment in a hospital for psychiatric disabilities," and (3) "the reasons for [the physician's] opinion."[19] General Statutes § 17a-502 (a).

Under General Statutes (Supp. 2026) § 52-146e (a), "[e]ach communication and record" relating to a patient's

[19]Section 17a-502 also incorporates safeguards designed to protect patients from unnecessary commitment. A patient admitted under an

psychiatric diagnosis or treatment "shall be confidential and subject to the provisions of sections 52-146d to 52-146j, inclusive." Section 52-146e (a) generally prohibits disclosure of such communications and records without the patient's consent, and General Statutes (Supp. 2026) § 52-146j (b) provides a civil remedy to persons aggrieved by an unauthorized disclosure. General Statutes (Supp. 2026) § 52-146f, however, sets forth several exceptions to that rule. Most notably, a psychiatric mental health provider may disclose otherwise protected communications and records "when the . . . provider determines that there is substantial risk of imminent physical injury by the . . . patient to himself, herself or others . . . ." General Statutes (Supp. 2026) § 52-146f (2).

We are not persuaded that recognition of a limited, common-law duty to protect an identifiable third party from a known, substantial risk of imminent physical harm would conflict with or otherwise undermine these statutory schemes. Both statutory schemes reflect a legislative effort to balance a patient's liberty and privacy interests with the need to protect both the patient and the public from physical harm. The limited duty we recognize in this case is consistent with that legislative judgment.

First, by authorizing involuntary commitment pursuant to § 17a-502 (a) when a physician concludes that a patient with psychiatric disabilities is dangerous to himself *or others*, the legislature has recognized that the risk of harm to third parties may justify intruding on a patient's liberty, including the hospital's commitment

emergency certificate must "be examined by a physician specializing in psychiatry not later than forty-eight hours after admission . . . ." General Statutes § 17a-502 (b). If the psychiatrist determines that the patient does not meet the statutory criteria for emergency commitment, "such person shall be immediately discharged." General Statutes § 17a-502 (b); see also General Statutes § 17a-502 (f). Further, unless a written application for commitment has been filed, the patient must be discharged from the hospital after the fifteen day emergency hold has expired. See General Statutes § 17a-502 (a). In addition, patients must be informed of their legal rights, including the right to counsel and the right to a hearing at which they may challenge their commitment. See General Statutes § 17a-502 (c).

of, and assumption of control over, the patient to prevent that harm from occurring. Because involuntary commitment represents one of the most significant intrusions on personal liberty permitted outside of the criminal context, the statute's authorization of that remedy strongly suggests that preventing violence against others is an important objective of the statutory scheme.

Although we agree that the legislature's choice to make commitment permissive and discharge mandatory reflects its effort to protect patient liberty; see *State* v. *Dyous*, 307 Conn. 299, 325, 53 A.3d 153 (2012) (civil commitment statutory scheme "effectively places a thumb on the scale in favor of protecting individual liberty"); §17a-502 does not purport to define the full scope of a mental health care provider's responsibility to act reasonably when confronted with a known risk of imminent harm to an identifiable third party. Nor does it follow that the legislature intended to preclude any responsibility on the part of a mental health care provider who has *actual* knowledge that a patient poses a substantial risk of imminent physical harm to an identifiable individual. Indeed, as we discussed, by expressly authorizing commitment when a patient "is dangerous to himself or others," the legislature has recognized that the risk of harm to third parties may warrant *significant* intervention by mental health care providers. General Statutes §17a-502 (a).

Second, by creating the exception in General Statutes (Supp. 2026) §52-146f (2) allowing the disclosure of confidential communications and records "when the . . . provider determines that there is substantial risk of imminent physical injury by the . . . patient to himself, herself or others," the legislature has likewise acknowledged that, in certain circumstances, the public's interest in protecting potential victims from physical harm may outweigh the interest in preserving strict confidentiality. In cases in which a mental health care provider knows that a patient poses a substantial risk of imminent physical harm to others, disclosure of otherwise confidential

communications is expressly contemplated for the purpose of preventing such harm. Furthermore, unlike in *Jarmie*, in which we expressed concern that extending a physician's duty to members of the general public would expose confidential patient records to disclosure in litigation brought by third-party victims, thereby undermining the physician-patient relationship; see *Jarmie* v. *Troncale*, supra, 306 Conn. 607–609; here, the duty is narrowly confined to circumstances involving a known and specific risk to an identifiable individual and, therefore, does not give rise to the same concerns about widespread litigation or the corresponding invasion of privacy that we acknowledged in *Jarmie*. See id., 613–14.

The defendant further argues that the legislature's use of permissive statutory language "countervails against superimposing a common-law duty." In *Jarmie*, we relied on a statute permitting, but not requiring, physicians to report a patient's chronic health problems to the Department of Motor Vehicles as evidence of "the legislature's judgment that physicians owe no duty to the public to report even serious health problems that could affect a patient's driving ability." *Jarmie* v. *Troncale*, supra, 306 Conn. 604; see General Statutes § 14-46. Section 17a-502 (a) and General Statutes (Supp. 2026) § 52-146f (2) employ similar permissive language and can be understood to reflect the same legislative judgment that, when a patient poses a danger to *the public at large*, decisions regarding disclosure or intervention should be left to professional discretion. Nevertheless, as we recognized in *Fraser*, *Jacoby*, *Gazo*, and *Doe*, there is reason to come to a different conclusion when the health care provider is aware of a substantial risk of imminent harm to an identifiable third party. Thus, in the present context, the permissive language in the relevant statutes does not carry the same weight that it did in *Jarmie*.

Accordingly, our statutory schemes governing civil commitment and patient confidentiality support, rather than undermine, the conclusion that a mental health care provider has a common-law duty to take reasonable steps

not involving medical judgment to protect an identifiable third party from the known, substantial risk of imminent physical harm that the provider's patient poses. Recognition of such a limited duty does not (1) require commitment when the statute does not authorize it, (2) prevent discharge once the statutory criteria are no longer satisfied, or (3) expand the circumstances under which confidential communications may be disclosed. The duty is triggered only when the mental health care provider actually knows of a substantial risk of imminent physical harm to an identifiable individual. Thus, it neither disturbs the balance struck by the legislature nor places providers in conflict with their statutory obligations.[20]

The defendant raises several remaining policy objections, but none defeats recognition of the narrow duty at issue here. Specifically, the defendant contends that imposing a duty would subject mental health care providers' professional judgments to hindsight review, rest liability on unreliable predictions of future violence, encourage overly restrictive treatment and commitment practices, and expose providers to indeterminate liability. These concerns are substantially mitigated by the limited nature of the duty we recognize in this case, which arises only when the provider actually knows that the patient poses a substantial risk of imminent physical harm to an identifiable victim.[21]

---

[20]In *Jarmie*, we expressed concern that imposing a duty owed to a third party "would undeniably interfere with a physician's duty of loyalty to the patient" by requiring the physician, "in deciding when and how to advise the patient . . . to consider a second, possibly conflicting duty to persons who are not their patients." *Jarmie* v. *Troncale*, supra, 306 Conn. 607. That concern is significantly reduced in the present context because the legislature has already determined that a mental health care provider should consider the risk of harm a psychiatric patient poses to others and may, in certain circumstances, act to mitigate that risk through civil commitment or disclosure of patient communications. See General Statutes § 17a-502 (a); General Statutes (Supp. 2026) § 52-146f (2).

[21]Justice Morey Stanley Mosk of the California Supreme Court raised a similar concern in his concurring and dissenting opinion in *Tarasoff*. See *Tarasoff* v. *Regents of the University of California*, supra, 17 Cal.

For that reason, liability does not rest on impermissible hindsight review of the mental health care provider's

3d 451–52 (Mosk, J., concurring and dissenting). He expressed his disagreement with "the majority's rule that a therapist may be held liable for failing to predict his patient's tendency to violence if other practitioners, pursuant to the 'standards of the profession,' would have done so" because of the "[inherent unreliability of] psychiatric predictions of violence . . . ." Id., 451 (Mosk, J., concurring and dissenting). He concurred in the result, "only because the complaints allege[d] that [the] therapists did in fact predict that [the patient] would kill and were therefore negligent in failing to warn of that danger. Thus the issue . . . [was] very narrow: [the court was] not concerned with whether the therapists, pursuant to the standards of their profession, 'should have' predicted potential violence; they allegedly did so in actuality. Under these limited circumstances [Justice Mosk] agree[d] that a cause of action [could] be stated." Id. He concluded that, "[i]f a psychiatrist does in fact predict violence, then a duty to warn arises." Id., 452 (Mosk, J., concurring and dissenting).

In 1985, the California legislature enacted § 43.92 of the California Civil Code, which both codified the duty articulated by the court in *Tarasoff* and simultaneously limited the scope of that duty. See *Ewing* v. *Northridge Hospital Medical Center*, 120 Cal. App. 4th 1289, 1300–1301, 16 Cal. Rptr. 3d 591 (2004), review denied, California Supreme Court, Docket No. S127734 (November 10, 2004). The statute currently provides in relevant part: "There shall be no monetary liability on the part of, and no cause of action shall arise against, any person who is a psychotherapist . . . in failing to protect from a patient's threatened violent behavior or failing to predict and protect from a patient's violent behavior *except* if the patient has communicated to the psychotherapist a serious threat of physical violence against a reasonably *identifiable* victim or victims." (Emphasis added.) Cal. Civ. Code § 43.92 (a) (Deering Supp. 2026). Under the statute, the psychotherapist's duty is satisfied "by making reasonable efforts to communicate the threat to the victim or victims and to a law enforcement agency." Cal. Civ. Code § 43.92 (b) (Deering Supp. 2026).

Section 43.92 of the California Civil Code "was expressly not intended to overrule *Tarasoff* and its progeny, but rather to limit . . . psychotherapists' liability for failure to warn to those circumstances [in which] the patient has communicated an actual threat of violence against an identified victim . . . and to abolish the expansive [ruling] of *Tarasoff* . . . that a therapist can be held liable for the mere failure to predict and warn of potential violence by his patient." (Internal quotation marks omitted.) *Ewing* v. *Northridge Hospital Medical Center*, supra, 120 Cal. App. 4th 1300. California courts have since explained that "a psychotherapist may be held liable for failing to warn a third party of a threat of harm *only if* the plaintiff is able to persuade the trier of fact [that] the psychotherapist *actually believed or predicted* [that] the patient posed a serious risk of inflicting grave bodily injury [on] a reasonably identifiable victim or victims." (Emphasis added.) Id., 1301.

medical judgment, but on the reasonableness of the provider's response to a known risk of harm. It therefore does not require a trier of fact to determine whether the provider should have evaluated, diagnosed, or treated the patient differently in the first instance. For the same reason, the duty does not rest on abstract or inherently speculative predictions of future violence. The defendant is correct that psychiatric predictions of dangerousness may be uncertain and subject to disagreement. See, e.g., *State* v. *March*, 265 Conn. 697, 711, 830 A.2d 212 (2003) ("psychiatric predictions of future dangerousness are tentative at best and are frequently conceded, even within the profession, to be unreliable" (internal quotation marks omitted)). The duty we recognize, however, does not arise from a claim that a mental health care provider *should have* predicted violence in the abstract. The provider is not asked to speculate about the remote possibility of violence but, instead, to respond reasonably to a risk that the provider already has identified.

Nor does the duty compel defensive medical practices or encourage unnecessary commitment, as the defendant suggests. To be sure, in some circumstances, a reasonable response to a known, substantial risk of imminent physical harm may include efforts to control the patient, which could involve continued hospitalization. The limited duty we recognize, however, does not require commitment in circumstances not otherwise permitted by statute and requires only that the provider take reasonable steps not involving medical judgment to protect an identifiable victim consistent with what the statutes authorize. The discharge of a mental health care provider's duty of care will necessarily vary with the facts of each case, and it will be up to the fact finder to determine whether the steps taken to protect the identifiable victim were reasonable under the circumstances.

We also are not persuaded by the defendant's contention that recognizing a duty in these circumstances will "open the floodgates" and expose providers to a broad wave of nonpatient liability arising from patients'

subsequent acts of violence. Because the duty to take reasonable steps not involving medical judgment arises only when the mental health care provider has actual knowledge that a patient poses a substantial risk of imminent harm to a specific, identifiable victim, it applies in a relatively limited class of cases. See *Fraser* v. *United States*, supra, 236 Conn. 630 ( "litigation of this kind does not arise frequently"). Accordingly, recognition of such a duty does not create the kind of expansive exposure to liability that the defendant fears.

Finally, the parties disagree as to the significance of authority from other jurisdictions. The plaintiff contends that an overwhelming majority of courts have recognized some form of duty requiring mental health professionals to take reasonable steps to protect third parties from a patient's threatened violence. The defendant responds that such authority is of limited value because jurisdictions vary significantly in how they define and limit any such duty, and, in any event, Connecticut law governs.

We agree with the defendant that decisions from other jurisdictions are not controlling and that the scope of any duty in this context ultimately must be determined as a matter of Connecticut law. We are not persuaded, however, that the variations among jurisdictions render such authority unhelpful. Although courts have adopted differing formulations of the duty first articulated in *Tarasoff*, those variations largely involve the scope of the duty, not its existence. Indeed, the vast majority of jurisdictions recognize some variation of the *Tarasoff* duty, whether rooted in the common law or pursuant to statutory enactment.[22] See 2 Restatement (Third),

---

[22]Numerous jurisdictions have codified some iteration of this duty into law, with the majority of statutory schemes requiring an identifiable victim. See Cal. Civ. Code § 43.92 (a) (Deering Supp. 2026); Colo. Rev. Stat. § 13-21-117 (2) (a) (2025); Del. Code Ann. tit. 16, § 5402 (a) (1) (2003); Fla. Stat. Ann. § 456.059 (West 2022); Idaho Code § 6-1902 (2004); 405 Ill. Comp. Stat. Ann. 5/6-103 (b) (West Cum. Supp. 2026); Ind. Code Ann. §§ 34-30-16-1 through 34-30-16-3 (LexisNexis 2022); Iowa Code Ann. § 228.7A (2) (West Cum. Supp. 2025); Ky. Rev. Stat.

Torts, Liability for Physical and Emotional Harm § 41, reporter's note to comment (g), p. 78 (2012) ("[v]irtually all courts confronting the issue have decided that [mental health] professionals owe some affirmative duty to third parties with regard to patients who are recognized as posing dangers"); see also id., pp. 80–81 (citing cases).

The differences among jurisdictions instead reflect differing policy judgments regarding how best to balance competing considerations, and many jurisdictions, consistent with the limitation we first discussed in *Fraser* and now recognize in this case, restrict the duty to circumstances involving actual knowledge of a threat to a specifically identifiable or readily identifiable victim. See, e.g., *Morton* v. *Prescott*, 564 So. 2d 913, 916 (Ala. 1990) (psychiatrist has duty of care in connection with release of mental patient only when patient has made specific threats against identifiable third persons or members of identifiable group); *Emerich* v. *Philadelphia Center for Human Development, Inc.*, 554 Pa. 209, 224–26, 720 A.2d 1032 (1998) (mental health professional has duty to warn third party of potential harm by patient when patient conveys "a specific and immediate threat of serious bodily injury" against "a specifically identified or readily identifiable victim"); *Peck* v. *Counseling Service of Addison County, Inc.*, 146 Vt. 61, 68, 499 A.2d 422 (1985) ("a mental health professional who knows or, based [on] the standards of the mental health profession,

Ann. § 202A.400 (2) (LexisNexis 2020); La. Stat. Ann. § 9:2800.2 (A) (2018); Me. Rev. Stat. Ann. tit. 32, § 7007 (1) (Cum. Supp. 2026); Md. Code Ann., Cts. & Jud. Proc. § 5-609 (b) (LexisNexis 2013); Mass. Ann. Laws c. 123, § 36B (1) (LexisNexis 2017); Mich. Comp. Laws Serv. § 330.1946 (1) (LexisNexis 2017); Minn. Stat. Ann. § 148.975 (2) (West 2025); Mont. Code Ann. § 27-1-1102 (2023); Neb. Rev. Stat. § 38-3132 (2016); Nev. Rev. Stat. § 629.550 (1) (2025); N.H. Rev. Stat. Ann. § 329-B:29 (2025); N.J. Stat. Ann. § 2A:62A-16 (b) (West Cum. Supp. 2026); N.Y. Mental Hyg. Law § 9.46 (b) (McKinney Cum. Supp. 2026); Ohio Rev. Code Ann. § 2305.51 (B) (West Cum. Supp. 2026); Tenn. Code Ann. §§ 33-3-206 through 33-3-209 (2015 and Supp. 2025); Utah Code Ann. § 78B-3-502 (1) (LexisNexis 2012); Vt. Stat. Ann. tit. 18, § 1882 (b) (2023); Va. Code Ann. § 54.1-2400.1 (B) (2019); Wn. Rev. Code Ann. § 71.05.120 (3) (West Cum. Supp. 2026); Wis. Stat. Ann. § 51.17 (3) (West 2024).

should know that his or her patient poses a serious risk of danger to an identifiable victim has a duty to exercise reasonable care to protect him or her from that danger"). Some jurisdictions have adopted broader formulations, while a small minority have declined to recognize such a duty altogether.[23] These differences do not undermine the relevance of the broader consensus but, instead, underscore that the duty, when recognized, is carefully circumscribed.

Accordingly, we find it significant that our recognition of a limited duty is consistent with the prevailing approach in other jurisdictions, even though those jurisdictions differ in how they define the precise contours of that duty.[24]

When these considerations are viewed together, the statutory framework and relevant case law reflect a

[23]Some jurisdictions do not limit the duty to specifically identifiable victims. See, e.g., *Avitia* v. *Crisis Preparation & Recovery, Inc.*, 256 Ariz. 198, 200, 536 P.3d 776 (2023) ("mental health professionals owe a duty to third parties based . . . on their special relationship and public policy"). Only a few jurisdictions have declined to recognize a duty to warn. See, e.g., *Gregory* v. *Kilbride*, 150 N.C. App. 601, 607, 610, 565 S.E.2d 685 (2002) (concluding that "North Carolina does not recognize a psychiatrist's *duty to warn* third persons" but acknowledging that "an independent duty arises to protect third persons from harm by the *release* of a mental patient who is involuntarily committed" (emphasis added; emphasis in original)), review denied, 357 N.C. 164, 580 S.E.2d 365 (2003); *Thapar* v. *Zezulka*, 994 S.W.2d 635, 638–40 (Tex. 1999) (declining to adopt common-law duty to warn third parties of patient's threats); see also *Paddock* v. *Chacko*, 522 So. 2d 410, 417 (Fla. App. 1988) (psychiatrist has no duty to involuntarily hospitalize patient), review denied, 553 So. 2d 168 (Fla. 1989). But see Fla. Stat. Ann. § 456.059 (West 2022) (imposing duty on psychiatrists to warn law enforcement of patient's threats).

[24]As we previously discussed, this court's interpretation of § 52-190a has, in most circumstances, operated to preclude at the pleading stage negligence claims brought by nonpatients against health care providers when such claims are characterized as alleging professional negligence. See *Jarmie* v. *Troncale*, supra, 306 Conn. 587. Although a number of jurisdictions have enacted statutory schemes that, like § 52-190a, require some form of presuit certification in actions alleging medical negligence; see, e.g., Mass. Ann. Laws c. 231, § 60B (LexisNexis 2009); N.J. Stat. Ann. § 2A:53A-27 (West 2014); see also Pa. R. Civ. P. 1042.3; those provisions generally operate as procedural screening mechanisms

consistent policy balance between patient confidentiality, professional judgment, and the protection of the public from serious physical harm. Recognition of a limited duty requiring mental health care providers to exercise reasonable care under the circumstances to protect an identifiable victim when they have determined that a patient poses a substantial risk of imminent physical harm to that identifiable victim is consistent with that balance and does not undermine the statutory scheme governing civil commitment or the policy considerations we discussed in *Jarmie*. Accordingly, we conclude that, in these circumstances, public policy supports the recognition of such a limited duty.

To the extent there was any question after *Fraser* and its progeny, we hold that a mental health care provider that knows that a patient poses a substantial risk of imminent physical harm to an identifiable third party owes a duty to that party to take reasonable steps to protect the party from the danger posed by the patient, which could include warning the party of the risk or controlling the patient.[25]

designed to deter frivolous claims, rather than as substantive limitations on *who* may bring a negligence action against a health care provider. Thus, other jurisdictions that have recognized duties to control or warn are not similarly constrained by statutory enactments analogous to § 52-190a, as interpreted by this court, and, therefore, generally need not determine whether such claims sound in ordinary negligence or professional negligence. Even in North Carolina, where "[i]t is well settled that the relationship of physician to patient must be established as a prerequisite to an actionable claim for medical malpractice"; *Easter* v. *Lexington Memorial Hospital, Inc.*, 303 N.C. 303, 305–306, 278 S.E.2d 253 (1981); when "a mental patient is wrongfully discharged and injures a third party outside the physician-patient relationship, general tort principles of negligence apply." *Gregory* v. *Kilbride*, 150 N.C. App. 601, 606, 565 S.E.2d 685 (2002), review denied, 357 N.C. 164, 580 S.E.2d 365 (2003); see also *Pangburn* v. *Saad*, 73 N.C. App. 336, 338, 326 S.E.2d 365 (1985).

[25]The defendant contends that, even if we recognize a duty to warn, no such duty would apply in this case because, based on the decedent's prior reports to law enforcement, she was already aware of the risk of harm Mollow posed to her, and "[t]here is no legal duty to warn someone of a hazard about which the person already knows." The defendant relies on *Kaminski* v. *Fairfield,* 216 Conn. 29, 578 A.2d 1048 (1990), in which

### III

Finally, the plaintiff, relying on this court's decision in *Squeo* v. *Norwalk Hospital Assn.*, supra, 316 Conn. 558, contends that the trial court improperly struck count seven of the complaint, which purported to assert a claim for gross medical negligence. The plaintiff's briefing on this issue, however, is limited. Aside from a brief assertion that the trial court erred in concluding that the claim was not cognizable as a matter of law under the circumstances of this case, the plaintiff does not provide any analysis explaining the legal basis for the claim or identifying the specific respect in which the trial court's reasoning is incorrect.

Although the plaintiff references *Squeo*,[26] she does not explain how that decision applies to the claim asserted

we held that parents did not breach a duty to warn a police officer about their adult schizophrenic son's dangerous propensities; see id., 30–31; in part because they had described their son's symptoms and his possession of axes to members of the responding crisis team, their son's condition was the precipitating factor for the officer's visit to the home, and the officer made no claim that the crisis team withheld the information from him. See id., 37–38. The circumstances in the present case are materially different. In *Kaminski*, the officer already possessed the same information that a warning would have conveyed, rendering any additional warning superfluous. See id. We are unwilling to conclude that the decedent's general awareness of Mollow's past threats, made while they were in a relationship and living together, established that she knew the danger he posed at the time of his hospitalization and subsequent release. Based on the allegations in the complaint, the defendant possessed different or more particularized information about the nature and severity of the risk of harm than previously known to the decedent, including whether and to what extent the former couple's separation and Mollow's involuntary hospitalization may have escalated that risk.

[26]In *Squeo* v. *Norwalk Hospital Assn.*, supra, 316 Conn. 558, we concluded that the plaintiffs—parents who had discovered their son, a patient of the defendant hospital, hanging in their yard, having taken his own life shortly after his allegedly premature and improper discharge from psychiatric hospitalization; see id., 560–61—had sufficiently alleged gross professional negligence and had stated a cognizable derivative claim for bystander emotional distress in the context of a medical malpractice action. See id., 581. Given the circumstances, we declined to conclude that a hospital that discharges an imminently suicidal patient, who had a long-standing psychiatric history that was known to the hospital, "could not have demonstrated gross negligence

here. In particular, the plaintiff does not identify how the claim in count seven resembles the derivative bystander emotional distress claim recognized in *Squeo* or why the reasoning of that decision should extend to the nonderivative claim asserted in this case. Nor does the plaintiff offer any analysis as to why the conduct alleged in this case would rise to the level of gross professional negligence contemplated in *Squeo*.[27] Indeed, before the trial court, the plaintiff acknowledged that this action seeks damages for wrongful death on behalf of the decedent's estate rather than damages for emotional distress, "so the holding in *Squeo* does not directly apply." In light of that position, the plaintiff's argument on appeal provides little guidance as to how *Squeo* would support recognition of the claim asserted here.

It is well established that appellate review ordinarily requires that claims be supported by adequate briefing and analysis. See, e.g., *Connecticut Coalition Against Millstone* v. *Connecticut Siting Council*, 286 Conn. 57, 87, 942 A.2d 345 (2008) ("We are not obligated to consider issues that are not adequately briefed. . . . Whe[n] an issue is merely mentioned, but not briefed beyond a bare assertion of the claim, it is deemed to have been waived. . . . In addition, mere conclusory assertions regarding a claim, with no mention of relevant authority and minimal or no citations from the record, will not suffice." (Citations omitted; internal quotation marks omitted.)). Because the plaintiff's argument regarding the legal sufficiency of her gross medical negligence count is not sufficiently developed to permit meaningful review, we decline to address it further.

in so doing, when the patient then proceeded to take his own life shortly after discharge." Id. We nevertheless upheld the trial court's decision granting the hospital's motion for summary judgment; id., 600; because the evidence submitted by the plaintiffs was insufficient "to create a genuine issue of material fact as to whether the plaintiffs suffered severe and debilitating mental distress such that they were unable to cope with the challenges of daily life." (Emphasis omitted.) Id., 599.

[27] Moreover, although count seven is labeled as a claim for "[g]ross [m]edical [n]egligence," the allegations underlying that count are materially identical to those asserted in the plaintiff's other negligence counts.

The judgment is reversed only as to those claims in counts two through six of the third amended complaint that may proceed under ordinary negligence principles consistent with this opinion and the case is remanded with direction to deny the defendant's motion to strike as to those claims; the judgment is affirmed in all other respects.

In this opinion MULLINS, C. J., and McDONALD, D'AURIA, ALEXANDER and DANNEHY, Js., concurred.